Exhibit D



**Wiley Rein & Fielding LLP**

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX       202.719.7049

Virginia Office
7925 JONES BRANCH DRIVE
SUITE 6200
McLEAN, VA 22102
PHONE  703.905.2800
FAX       703.905.2820

www.wrf.com

John B. Wyss
202.719.7038
jwyss@wrf.com

January 18, 2006

*Via Email And U.S. Mail*

Michael K. Plimack, Esq.
HellerEhrman LLP
333 Bush Street
San Francisco, California 94104-2878

Re:   *Inline Connection Corp. v. Verizon Internet Services, Inc. et al.*
       Case No. 1:05-cv-866-JJF (D. Del.)

Dear Mike:

Enclosed is a copy of the "ISP Defendants' Supplemental Response To Plaintiff's First Set Of Interrogatories (No. 10)" which is being served today.

Sincerely yours,

John B. Wyss

cc:   C. Joël Van Over, Esq. (via email & U.S. mail)
      Mary Graham, Esq. (via email & U.S. mail)
      Jeffrey B. Bove, Esq. (via email & U.S. mail)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Inline Connection Corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>Verizon Internet Services, Inc., et al.,<br><br>    Defendants. | Civil Action No. 1:05-cv-00866 JJF |

### ISP DEFENDANTS' SUPPLEMENTAL RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES (NO. 10)

Pursuant to Federal Rule of Civil Procedure 33, Defendants GTE.NET LLC and VERIZON INTERNET SERVICES, INC. (collectively, "ISP Defendants") hereby provide a supplemental response to Interrogatory No. 10 in INLINE CONNECTION CORPORATION's ("Inline") First Set of Interrogatories.

### GENERAL OBJECTIONS

1. ISP Defendants object to the definitions and instructions to the extent they seek to impose burdens or obligations different from or in addition to those required by the Federal Rules of Civil Procedure ("Federal Rules") or the Local Rules of the District of Delaware ("Local Rules"). While ISP Defendants may choose to use Inline's definitions and instructions as a guide in some cases, ISP Defendants do not concede or stipulate to their validity or appropriate usage in these proceedings.

2. ISP Defendants object to these interrogatories to the extent they seek information or documents protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege. Nothing contained in these objections or responses, and any

privileged document that is inadvertently produced, are intended to be, or in any way may be deemed, a waiver of any such available privilege or doctrine. ISP Defendants object to identifying documents generated after filing of the action against Verizon Communications Inc. ("VCI") in the District of Delaware, as such identification is likely to reveal work-product and/or attorney-client privileged information and would be unreasonably burdensome.

3. ISP Defendants object to these interrogatories to the extent they seek information already in Inline's possession, including, but not limited to, documents and things relating to the Delaware Actions against AOL, Earthlink, and VCI, and the prosecution histories of all patents and applications, domestic or foreign, filed on behalf of, or by Inline. ISP Defendants will not copy or produce any of the documents and things already in Inline's possession. ISP Defendants, however, do intend to rely upon all such documents in this Action.

4. ISP Defendants object to these Interrogatories to the extent they seek confidential information, highly sensitive business information, and/or the confidential information of third parties. ISP Defendants will provide its responses and documents and things only after the entry by the Court of an appropriate Protective Order, agreed upon by the parties, that adequately protects ISP Defendants confidential and/or highly sensitive business information and the confidential information of third parties, and only after Inline provides ISP Defendants with full access to all the materials from the actions in Delaware against America Online Inc. and Earthlink, Inc. ("the Delaware Actions") as previously requested by ISP Defendants on June 10, 2005. Confidential information of third parties will be provided only after the entry by the Court of an appropriate Protective Order agreed upon by the parties, that adequately protects the confidential information of third parties, and the consent of the third parties.

5. ISP Defendants object to the identification or production of any documents or things prior to receipt of Inline's commitment to pay copying costs, calculated at a reasonable rate for complex litigation copying.

6. ISP Defendants object to Inline's interrogatories to the extent they seek information that ISP Defendants cannot reasonably identify, compile, prepare, and/or produce within prescribed time limits.

7. ISP Defendants object to Inline's interrogatories to the extent they mischaracterize ISP Defendants or any fact alleged by ISP Defendants. By responding to Inline's interrogatories, ISP Defendants do not admit that Inline's characterizations are accurate or correct.

8. ISP Defendants object to each interrogatory to the extent it seeks information that is publicly accessible because it is equally convenient for Inline to obtain such information.

9. ISP Defendants object to the definition of "You," "Your," and "Defendant" to the extent that it attempts to include persons and/or entities not employed by or within the control of ISP Defendants and includes persons and/or entities not known to ISP Defendants.

10. ISP Defendants object to the definition of "Inline," and "Plaintiff" to the extent that it attempts to include persons and/or entities whose relationship to Inline is not known or is unavailable. It is unreasonable to expect ISP Defendants to have complete knowledge of all of Inline's "corporate predecessor[s], and any past or present division, department, parent, subsidiary, affiliate, director, officer, principal, agent, employee, consultant, representative, or other person acting on its behalf or under its control."

11. ISP Defendants object to the these interrogatories as well as to the definitions of the "'596 patent," the "'718 patent," the "'446 patent," and the "'585 patent," as Inline has repeatedly refused to provide interrogatory answers identifying which claims of the foregoing

patents are at issue in this case, and therefore any interrogatories related to, bearing upon, describing or discussing any of these patents is premature and over-inclusive. The patents-in-suit contain 139 claims. Inline has no good faith basis for asserting that every claim of the patents-in-suit is infringed.

12. ISP Defendants object to the definition of "Accused Services" to the extent that Inline has repeatedly refused to identify or delineate which of the services offered by Verizon are specifically at issue in this case. Inline, in the Delaware Actions, only alleged infringement of splitterless ADSL services. Inline further admitted that other types of ADSL services do not infringe. Inline is bound by these judicial representations in Delaware. ISP Defendants object to the definitions of "Wholesale Services" and "Retail Services" on the same basis, as subsets of the "Accused Services."

13. ISP Defendants object to the definition of "Accused Equipment" to the extent that Inline has refused to identify or delineate what equipment is at issue in this case. Moreover, all the claims of the patents-in-suit are system or method claims. Inline, in the Delaware Actions, only alleged infringement of splitterless ADSL services. Inline further admitted that other types of ADSL services do not infringe. Inline is bound by these judicial representations in Delaware. ISP Defendants object to any definition of "Accused Equipment" that extends beyond equipment relating to splitterless ADSL services utilizing a remote location DSLAM. *See Inline Connection Corp. v. AOL Time Warner Inc., et al.*, 302 F. Supp. 2d 307 (D. Del. 2004); *Inline Connection Corp. v. AOL Time Warner Inc., et al.*, 2005 U.S. Dist Lexis 6252 (D. Del. 2005).

14. ISP Defendants object to Inline's interrogatories to the extent that they are premature contention interrogatories. Discovery in this case is ongoing, and ISP Defendants are entitled to a reasonable period to conduct discovery and investigate the subject matter of the interrogatories.

15. ISP Defendants object to Inline's interrogatories to the extent they seek to circumvent any dates that may be established by the Court's Scheduling Order, any other order, statute, and/or by agreement of the parties.

16. ISP Defendants object to each interrogatory to the extent it seeks expert discovery prior to the expert discovery period. ISP Defendants will not provide information in response to any interrogatory to the extent such information is covered or protected by Fed. R. Civ. P. 26(b) or the work product doctrine as applied to non-testifying experts or to testifying experts prior to the expert discovery phase.

17. Any objection or lack of objection to an interrogatory is not to be deemed an admission by ISP Defendants that it is aware of information that is called for by the interrogatory.

18. ISP Defendants' investigation of matters relevant to these interrogatories is ongoing. ISP Defendants reserve the right to supplement their responses as appropriate. ISP Defendants also reserve the right to supplement their responses up to and including the time of trial in the event that it discovers additional documents and/or information responsive to Inline's interrogatories, and further reserve the right to supplement any objections based on such newly discovered documents and/or information.

19. These general objections are applicable to and are incorporated into each specific response, with or without further reference. Express insertion of any of the foregoing objections into the response and/or objections to any particular interrogatory shall not be construed as a waiver of any such general objection in that or any other response.

## INTERROGATORIES AND RESPONSES

### Interrogatory No. 10:

To the extent that You contend that Inline's claims of the infringement of the Inline Patents are barred by the doctrines of estoppel, laches, and/or waiver, Describe With Particularity the basis of Your contention.

### Objections:

ISP Defendants object to this interrogatory as a premature contention interrogatory. ISP Defendants further object to this interrogatory to the extent it prematurely seeks expert discovery prior to the expert discovery period. ISP Defendants object to this interrogatory because Inline has not produced all of the documents and discovery responses relating to the Delaware Actions, as previously requested by ISP Defendants on June 10, 2005. ISP Defendants further object to this interrogatory because third parties have not produced all of the documents and discovery responses previously requested by ISP Defendants. ISP Defendants expressly reserve the right to supplement any response to this Interrogatory after all the documents that pertain to the Delaware Actions or that are produced by third parties have been produced to ISP Defendants.

### Response to Interrogatory No. 10:

Subject to and without waiver of the foregoing general and specific objections, the ISP Defendants answer as follows:

Defendants' factual investigation concerning unenforceability of the Inline Patents based upon the doctrines of prosecution laches, estoppel, laches and/or waiver are continuing at this time. Defendants have been substantially prejudiced by Inline's unexplained and unreasonable delay in prosecuting the patents-in-suit and the further delay in filing the present lawsuit. Many files and documents from the 1980s and 1990s have been lost or have otherwise become unavailable due to this delay. Many potential witnesses have died or left the employ of Verizon. Defendants are still assessing the full adverse impact of Inline's prejudicial delay. The following

information reflects initial inquiries to date and will be supplemented as Defendants' investigations continue in the future.

There were many types of systems sold and used in the 1970s and 1980s to transmit both voice and data simultaneously over twisted-pair telephone wires. By the time Inline filed the present lawsuit in April of 2005, much of the technical information relating to these prior art systems had been lost, destroyed, or widely scattered so as to become unavailable.

While working for BBN in the late 1980s, Inline's principal, David Goodman, allegedly conceived and began reducing to practice a system for transmitting analog video signals (*e.g.*, from a VCR) and infrared control signals (from a TV remote control device) over active telephone wiring between rooms within a residence. Goodman was aware that, prior to any of his work, various types of analog and digital signals had been transmitted above voiceband over active, twisted-pair telephone wires. Goodman filed an application concerning his alleged invention (*i.e.*, analog video signals/infrared control signals over active telephone wires between rooms within a residence) on July 14, 1989. Neither this original application, nor any subsequent CIP application, satisfies either the "written description" or the "enablement" requirements under 35 U.S.C. §112 to support the full scope of the claims as asserted by Inline in this litigation.

During the 1980s, Bellcore was developing ADSL technology that would permit the simultaneous transmission of both voice telephone signals and high-speed data (at frequencies above voiceband) from a telephone company central office to residences and businesses over the "customer loops," *i.e.*, twisted-pair copper telephone lines. Industry committees to standardize the new ADSL technology were already active by about 1990. By or about the early 1990s, Goodman was aware of Bell Atlantic's plans to implement ADSL technology to deliver, *inter alia*, voice signals and video signals from the central office to its subscribers.

On December 5, 1991, Goodman filed three CIP applications. The new matter disclosed in the CIP applications was limited to the distribution of signals over the internal telephone wires of a residence or, at most, from a point located adjacent to a residence, such as telephone pole or a telephone company pedestal located within a few hundred feet of the residence. Goodman and his patent attorneys deliberately delayed substantive prosecution of the three CIP applications.

By at least mid-1992, Goodman and Inline were aware that both Bell Atlantic and NYNEX had already announced ADSL systems that would transmit 1.5 Mbs of compressed digital video just above voiceband over the entire length of twisted pairs leading from the central office to the subscriber's residence. Throughout 1992, Inline closely followed the ADSL activities of Bell Atlantic and other telephone companies, including Bell Atlantic's announcement that it would conduct initial trials of an ADSL system in the spring of 1993.

In early 1993, Inline continued to closely monitor Bell Atlantic's ADSL activities. Inline's President, David Goodman, wrote to Bell Atlantic in March of 1993 asserting that his inventions might be used as an adjunct to Bell Atlantic's ADSL system to deliver a video signal over the last 200 feet or so to the subscriber's residence. Goodman expressly advised potential investors in Inline that Bell Atlantic's ADSL system infringed Inline's patent. In addition, in May of 1993, Goodman and Inline publicly announced that "his patent attorneys, Fish and Richardson of Boston, have determined that [Inline's] patent covers the ADSL ... system developed by BellCore, and planned for introduction by Bell Atlantic this summer."

In mid-1993, Goodman and Inline had discussions with Bell Atlantic employees about the Bell Atlantic ADSL system. During these discussions, Goodman admitted that he did not know whether the technology he had developed for Inline could even be used to send a digital signal. Nevertheless, Goodman called Bell Atlantic employees and expressly accused the Bell Atlantic

ADSL system of infringing Inline's patent rights. Shortly thereafter, Goodman and Inline publicly confirmed these infringement accusations, expressly stating that Inline's "patent and patent applications give Inline claim to many developments that will have significant impact on the communications industry ... [including] the Asymmetric Digital Subscriber Line (ADSL) system ... now being tested by Bell Atlantic" (ICC/VZ 047743). Inline also publicly disclosed to The Wall Street Journal, The New York Times and The Washington Post that: "Inline has been advised by its patent attorneys, Fish & Richardson of Boston, that the [Bell Atlantic] ADSL system infringes its patent."

Faced with specific threats of infringement, Bell Atlantic undertook good faith efforts to ensure that its ADSL technology did not infringe any of Inline's patent rights. At that time, Inline had only one published patent, i.e., the '399 Patent that issued in April, 1991. Inline never disclosed to Bell Atlantic either the existence or contents of its three December 1991 CIP applications.

In July of 1993, Inline was already scheduling meetings with attorneys from a litigation law firm that might bring a patent infringement action. Goodman and Inline were also closely tracking and monitoring the activities of the T1E1.4 committee that was developing industry standards for ADSL systems. Goodman and Inline participated in various meetings of the T1E1.4 committee. At no time did Goodman or Inline ever disclose to the T1E1.4 committee members existence or the contents of Goodman's December 1991 CIP applications or that he was deliberately delaying substantive prosecution of those applications until the committee had completed its work and issued its ADSL standards.

During the rest of 1993, Goodman and Inline continued to disclose publicly that Fish & Richardson had advised Inline that its patents covered the Bell Atlantic ADSL system. Inline

also received a written offer from a law firm to represent Inline on a contingency basis in patent infringement litigation against Bell Atlantic. At the same time, Inline also contacted other litigation firms, including Fish & Richardson, about bringing suit against Bell Atlantic for patent infringement on a contingency basis. Goodman also acknowledged to potential investors in Inline that he had accused Bell Atlantic of patent infringement, but that Bell Atlantic declined his demand for royalties.

In late 1993 and 1994, Inline representatives continued to contact Bell Atlantic employees and reconfirm Inline's prior accusations that the Bell Atlantic ADSL system infringed Inline's patent rights. Bell Atlantic wrote to Inline on January 25, 1994, informing Goodman that Bell Atlantic had decided not to pursue the technology disclosed in Inline's '399 Patent (*i.e.*, the transmission of analog video signals/infrared control signals over active telephone wires between rooms within a residence) and declining Goodman's requests for further meetings. At the same time, Bell Atlantic expressly requested that Goodman and Inline "continue to keep [Bell Atlantic] informed of any new patents that are issued to or acquired by Inline Connection." Inline never responded to Bell Atlantic's written request. In particular, Inline never advised Bell Atlantic regarding the existence or the contents of the three December 1991 CIP applications. Instead, Inline and its patent attorneys continued to keep secret the existence and the contents of and to delay any further substantive prosecution of those CIP applications. Such delays would make it harder for Bell Atlantic or other companies to later challenge the validity of any patents that might issue because information about Bellcore's development of ADSL technology and the other prior art systems would become unavailable.

Thereafter, Goodman and Inline continued to closely monitor and track Bell Atlantic's development and deployment of its ADSL system, as well as the ongoing standardization

activities of the T1E1.4 committee. In March of 1995, Goodman expressly represented and disclosed to a third-party potential investor in Inline that: "Fish and Richardson, Inline's patent law firm, recently opened up a department to handle 'contingency' cases. Because they know of Inline's claim against the Bells, they invited me for a meeting on February 27th. They agreed that Inline's patent very clearly covered the ADSL technology, and they are currently studying the possibility of taking Inline's case on contingency. If they don't take the case, I know of another very good patent firm that will." At the same time, Inline and its patent attorneys continued to keep secret the existence and the contents of the CIP applications and to delay substantive prosecution of these CIP applications.

During the period 1990 through 1995, the T1E1.4 committee conducted a substantial portion of its standardization activity regarding ADSL technology. Although Inline continued to closely track and monitor the activities of the T1E1.4 committee, it never disclosed to the committee either the existence or contents of the three December 1991 CIP applications, or the fact that Inline and its patent attorneys were continuing to delay substantive prosecution of the CIP applications while the committee developed its new ADSL industry standards. Both Bell Atlantic and the entire telecommunications industry invested substantial amounts of time, effort and money in the T1E1.4 Committee's ADSL standardization project.

In January of 1996, Goodman conceived and disclosed a new idea on how some of his previous concepts could be extended to apply to the field of Internet access. Goodman admitted that he had not previously conceived this idea and that his thinking about his new Internet invention was changing from day to day. Nonetheless, Goodman subsequently conspired with his patent attorneys to mislead the PTO into believing that his newly conceived inventions had

been part of his earlier July 1989 parent application and the third December 1991 CIP application.

Thereafter, Goodman and Inline continued to closely track and monitor Bell Atlantic's development and deployment of ADSL systems. They were aware at that time that ADSL would be popular because of the Internet and not because of video. For this reason, Goodman and Inline's patent attorneys had to suppress the fact that Goodman first conceived his Internet invention in early 1996, and had to further delay substantive prosecution of the third December 1991 CIP application. At the same time, Inline continued to negotiate contingency relationships with several law firms to bring patent infringement actions regarding ADSL systems used for hi-speed Internet access or video-on-demand services.

After the publication of the T1E1.4 Committee standards and technical papers, and after a huge investment by Bell Atlantic, NYNEX, GTE and the other RBOCs in deployment of ADSL technology, Inline and its patent attorneys finally began drafting new claim language for the deliberately delayed third December 1991 CIP application. The new claim language was first filed on April 13, 1998 and was rejected for double patenting in light of Inline's previous '399 Patent that had issued seven years earlier. The PTO expressly found that "there is no apparent reason why [Goodman] was prevented from presenting claims corresponding to those of the instant application [*i.e.*, the newly submitted 4/13/98 claim language]" during prosecution of the '399 Patent in 1989 and 1990. Goodman did not contest, and expressly acquiesced in, the PTO's ruling by filing a terminal disclaimer. The newly filed claims subsequently issued on December 1, 1998 as the '596 Patent at issue in this case.

Thereafter, Inline and its patent attorneys continued to keep alive additional co-pending continuation applications from the third December 1991 CIP application. On July 27, 1999, they

again submitted newly drafted claim language which, after amendments and another terminal disclaimer with respect to the '399 Patent, issued on June 5, 2001 as the '466 Patent at issue in this case. Similarly, on April 18, 2002, Goodman and his patent attorneys submitted another set of entirely new claims which, after amendment and another terminal disclaimer with respect to the '399 Patent, issued on April 1, 2003 as the '585 Patent at issue in this case.

Goodman and Inline's patent attorneys engaged in the same type of deliberate prosecution delay tactics with respect to continuation applications stemming from the original July 14, 1989 parent application. They kept alive a long series of co-pending continuation applications while Goodman tracked and monitored the T1E1.4 committee standardization activities and the massive investment and development of ADSL systems by Verizon (as successor to Bell Atlantic, NYNEX and GTE) and other RBOCs. In March of 2000, after almost ten years of unexplained delay, Goodman and Inline's patent attorneys submitted entirely new claim language in a continuation of the original July 1989 parent application designed to cover ADSL technology. In doing so, they failed to advise the PTO of Goodman's admissions that his original conception was limited to the transmission of full video/infrared control signals between rooms within a residence and that he did not even conceive his "Internet" invention until at least January of 1996, at the earliest. As a result, and after the filing of another terminal disclaimer, the PTO allowed the new claims to issue on May 22, 2001 as the '718 Patent at issue in this case. Finally, Goodman and Inline's patent attorneys repeated the same ploy with additional claim language submitted to the PTO for the first time in 2001, which was subject to terminal disclaimer, and has now issued as the '573 patent.

In June of 2002, Inline filed suit against Verizon Communications, Inc. ("VCI") in the District of Delaware for infringement of the patents-in-suit. When VCI pointed out that Inline

had named the wrong Verizon entity, Inline made no attempt to amend its June 2002 complaint to add any of the Verizon defendants subsequently named in the present action refiled almost three years later in a different court. There is no reason why Inline could not have amended to add the two ISP defendants (Verizon Internet Services, Inc., and GTE.net LLC) back in the summer of 2002. Thereafter, Inline continued to litigate the exact same patents against AOL and Earthlink, which cases are still pending and active. The Verizon defendants reasonably believed that Inline had abandoned its patent infringement claims against Verizon. The Verizon defendants have been prejudiced by being excluded from claim construction and other aspects of the AOL and Earthlink actions.

Respectfully submitted,

By: /s/ John B. Wyss
John B. Wyss
Kevin P. Anderson
WILEY REIN & FIELDING LLP
1776 K Street NW
Washington, DC 20006
Telephone: 202.719.7000
Facsimile : 202.719.7049

Jeffrey B. Bove
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street, Suite 878
Wilmington, DE 19801
Telephone: (302) 658-9141
Facsimile: (302) 658-5614

Dated: January 18, 2005                    Counsel for Verizon Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January 2006, a true copy of the foregoing *ISP Defendants' Supplemental Response To Plaintiff's First Set Of Interrogatories (No. 10)* was sent to plaintiff's counsel, in the manner indicated, upon:

Michael K. Plimack, Esq.   (Served electronically and by overnight delivery)
Alexander L. Brainerd, Esq.
HELLER EHRMAN LLP
333 Bush Street
San Francisco, California 94104
Alexander.Brianerd@hellerehrman.com
Michael.Plimack@hellerhrman.com

C. Joël Van Over, Esq.   (Served electronically and by overnight delivery)
Robert C. Bertin, Esq.
SWIDLER BERLIN LLP
3000 K Street, NW
Suite 300
Washington, DC 20007-5116
cjvanover@swidlaw.com
rcbertin@swidlaw.com

Mary Graham, Esq.   (Served electronically and by overnight delivery)
Julia Heaney, Esq.
Morris Nichols Arsht & Tunnell LLP
1201 N. Market Street
Post Office Box 1347
Wilmington, Delaware 19899-1347
mgraham@mnat.com
jheaney@mnat.com

_____
John B. Wyss