Exhibit 2

*Inline Connection Corporation   v.*
*AOL Time Warner Incorporated, et al.*

*Hearing*
*February 28, 2006*

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE   United States of America   19801*
*(302) 658-6697*

*Original File 022806~1.TXT, 82 Pages*
*Min-U-Script® File ID: 1468434240*

**Word Index included with this Min-U-Script®**

Case 1:05-cv-00866-JJF    Document 88-3    Filed 03/28/2006    Page 2 of 9

Inline Connection Corporation v.
AOL Time Warner Incorporated, et al.

Hearing
February 28, 2006

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF DELAWARE
INLINE CONNECTION          )
CORPORATION,               )
        Plaintiff,         )
                           ) C.A. No. 02-272-MPT
v.                         )
AOL TIME WARNER            )
INCORPORATED, et al.,      )
        Defendants.        )
INLINE CONNECTION          )
CORPORATION,               )
        Plaintiff,         ) C.A. No. 02-477-MPT
v.                         )
EARTHLINK, INC.,           )
        Defendant.         )

                Tuesday, February 28, 2006
                9:03 a.m.
                Teleconference in Chambers
                844 King Street
                Wilmington, Delaware
BEFORE: THE HONORABLE MARY PAT THYNGE
        United States District Court Magistrate
```

Page 2

APPEARANCES:
    MORRIS, NICHOLS, ARSHT & TUNNELL
    BY: JULIA HEANEY, ESQ.
        -and-
    SWIDLER, BERLIN, SHEREFF, FRIEDMAN, LLP
    BY: C. JOEL VAN OVER, ESQ.
    BY: KY KIRBY, ESQ.
        Counsel for the Plaintiffs
    RICHARDS, LAYTON & FINGER
    BY: FREDERICK COTTRELL, III, ESQ.
    BY: KELLY FARNAN, ESQ.
        -and-
    LATHAM & WATKINS, LLP
    BY: ROBERT J. GUNTHER, ESQ.
    BY: KURT M. ROGERS, ESQ.
        Counsel for Defendant
        AOL Time Warner Incorporated
    DUANE MORRIS, LLP
    BY: GARY LIPKIN, ESQ.
    BY: NORWOOD JAMESON, ESQ.
    BY: CLAUS D. MELARTI, ESQ.
        Counsel for Defendant
        Earthlink, Inc.
    WILEY, REIN & FIELDING
    BY: JOHN WYSS, ESQ.
        Counsel for Verizon

Page 3

[1] THE COURT: Good morning. This is [2] Judge Thynge.

[3] MS. HEANEY: Good morning, Your [4] Honor.

[5] THE COURT: All right. Before we [6] begin, I'd like to know — I'd just like to tell [7] you — first of all, it's Hawkins who is taking [8] this down, and Heather is the court reporter.

[9] I recommend that you get a copy of [10] the transcript because this may serve as any [11] order. And also, counsel, I have executed the [12] modification for the discovery regarding expert [13] witnesses. I signed that yesterday.

[14] And, also, executed an order for [15] admission pro hac vice. I can't remember who had [16] made the request. That was also signed [17] yesterday.

[18] Could I please have the names of [19] counsel that are participating on behalf of [20] Inline?

[21] MS. HEANEY: Your Honor, this is [22] Julie Heaney, and I have Ky Kirby of Swidler [23] Berlin, and Joel Van Over of Swidler Berlin.

[24] THE COURT: Ky, could you spell your

Page 4

[1] name?

[2] MS. KIRBY: My first name is Ky, [3] K-Y. Last name, K-I-R-B-Y, from Swidler.

[4] THE COURT: Thank you, Ky.

[5] MS. KIRBY: Thank you.

[6] THE COURT: Who is participating on [7] behalf of AOL?

[8] MS. FARNAN: Good morning, Your [9] Honor. Kelly Farnan in Delaware. Fred Cottrell [10] is here with me, and we have Bob Gunther and Kurt [11] Rodgers, both of Latham & Watkins.

[12] THE COURT: Who is participating on [13] behalf of Earthlink?

[14] MR. LIPKIN: Good morning, Your [15] Honor, this is Gary Lipkin, local counsel for [16] Earthlink. And I have with me Woody Jameson and [17] Claus Melarti.

[18] THE COURT: Could you spell that?

[19] MR. LIPKIN: M-E-L —

[20] THE COURT: I'm sorry. Spell it [21] again.

[22] MR. LIPKIN: M-E-L-A-R-T-I.

[23] THE COURT: T-Y?

[24] MR. LIPKIN: T-I.

Page 5

[1] THE COURT: T-I. Thank you. [2] You're breaking up a little bit, [3] Gary, so I didn't know if there's a problem.

[4] First of all, I'd just like to have [5] just an outline or a statement, a very brief [6] statement of the issues of plaintiff, that [7] plaintiff has concerning the discovery matters. [8] And then I want the same for each defendant.

[9] So who's going to be doing the [10] presentation on behalf of the plaintiff?

[11] MS. KIRBY: Your Honor, this is Ky [12] Kirby.

[13] MR. JAMESON: Your Honor, this is [14] Woody Jameson. Let me interrupt, because there [15] needs to be one more introduction.

[16] I apologize. John Wyss is on the [17] telephone as well, and I just wanted you to be [18] aware of that.

[19] And, John, why don't you just [20] introduce yourself to the Court.

[21] MR. WYSS: Your Honor, this is John [22] Wyss. It's spelled W, second letter is a Y, as [23] in yellow, two S's as in Sam.

[24] I'm with Wiley, Rein & Fielding in

Page 6

[1] Washington, D.C. Our firm represents various [2] Verizon entities in a parallel lawsuit that has [3] recently been moved up to the District of [4] Delaware and is pending before Judge Farnan [5] brought by Inline against various Verizon [6] companies.

[7] THE COURT: Okay. All right. [8] I would like to go back again and [9] start again, Ky, as to a very, very brief outline [10] of the discovery issues. And what I'm just [11] looking for is just a statement of the issues [12] that plaintiff wishes to address today.

[13] MS. KIRBY: All right. Your Honor, [14] we have a situation where Verizon has directed [15] AOL and Earthlink to withhold from their [16] supplemental productions certain Verizon [17] documents. Verizon is taking the position that [18] one of our experts who consulted with Verizon [19] years before must somehow have been violating [20] confidentiality obligations to Verizon in [21] connection with those consulting agreements.

[22] Now, the consultant agreements have [23] nothing to do with this case. And, certainly, [24] the documents that are being withheld are

Page 7

[1] something that our expert, who is Dr. Jackson — [2] I believe the Court knows him — have never seen [3] before.

[4] But Verizon refuses to permit AOL [5] and Earthlink to produce those documents to us.

[6] THE COURT: All right. Is that the [7] only issue that you presently have, Ky?

[8] MS. KIRBY: Yes, it is, Your Honor.

[9] THE COURT: Okay. Thank you. [10] Are there any independent issues [11] by — independent of this particular issue [12] besides a response on behalf of AOL and [13] Earthlink?

[14] MR. GUNTHER: Your Honor, this is [15] Bob Gunther for AOL. I am — I think I'm going [16] to speak on behalf of Earthlink as well for this [17] one.

[18] There is one issue. That is, Your [19] Honor, that, and again, I'll do this just in [20] outline form, that in February of this year, [21] when Inline supplemented its document [22] production, it produced to us an agreement with a company called [23] Mercury Communications that indicated that [24] Mercury had become — had essentially taken all

Page 8

[1] substantial rights in the patents in the patents [2] that are involved in this lawsuit.

[3] THE COURT: Mm-hmm.

[4] MR. GUNTHER: We have followed up [5] on that. We believe that should have been [6] disclosed to us much earlier.

[7] We have followed up on this and [8] asked for all documents relating to — and [9] again, these are document re-

Case 1:05-cv-00866-JJF    Document 88-3    Filed 03/28/2006    Page 3 of 9

Inline Connection Corporation v.
AOL Time Warner Incorporated, et al.

Hearing
February 28, 2006

[3] **MS. VAN OVER:** Your Honor, Joel. I [4] know that Dr. Jackson is not, or at least I [5] believe he's not in town today.

[6] **THE COURT:** Okay. Is he —

[7] **MS. VAN OVER:** I think he's [8] returning tomorrow, and I don't know how to reach [9] him. I can Email him, but he may not get my [10] Email.

[11] **THE COURT:** Where is Dr. Jackson [12] normally?

[13] **MS. VAN OVER:** He is in the D.C. [14] area.

[15] **THE COURT:** Okay. I just wanted to [16] make sure he wasn't, like, out in California and [17] he's hoofing it across the United States.

[18] Okay. So he's close by.

[19] **MS. VAN OVER:** Yes.

[20] **THE COURT:** Okay. All right.

[21] Well, those days are — I just need [22] to know which date and which time, and I think [23] that everybody needs to — counsel all needs to [24] coordinate with one another regarding this. So

Page 42

[1] to some extent the laboring is put on Ky and Joel [2] to find out from Dr. Jackson and his attorney.

[3] And I would suggest that you try to [4] get in touch with his attorney as well, [5] independent of Dr. Jackson to find out which date [6] is preferred.

[7] Woody, I'm sorry if it turns out [8] that Monday is the date, but I'm trying to get [9] this on the calendar sooner rather than later —

[10] **MR. JAMESON:** I understand.

[11] **THE COURT:** — as far as that's [12] concerned, and just get — and then counsel [13] coordinate with each other, and tell me which day [14] they're going to go with.

[15] And then we will make arrangements [16] here to make certain that Hawkins Reporting is [17] available. I will tell you that I need to know [18] by no later than Friday morning, March 3rd.

[19] I don't want an Email sent to me or [20] a letter sent to me by fax or by Email after five [21] o'clock on Friday, March 3rd, so that we wouldn't [22] have known until Monday morning. I'm not going [23] to scramble.

[24] So that's the circumstances. And I

Page 43

[1] certainly expect that I'll have the information [2] from counsel concerning the documents that they [3] feel appropriate for me to review regarding [4] Dr. Jackson's life with Verizon, and the concerns [5] or the communications that have occurred with his [6] attorney or from his attorney.

[7] **MR. GUNTHER:** Your Honor, this is [8] Bob Gunther. Can I just raise one note. I hope [9] note with respect to this whole issue.

[10] One of the things that at the outset [11] when we were talking about what Inline had to [12] provide to the Verizon folks is, basically, as [13] the Court stated, I just wrote down in my notes [14] what confidential Verizon documents Inline has [15] shown to Dr. Jackson.

[16] **THE COURT:** Mm-hmm.

[17] **MR. GUNTHER:** At the very end, Your [18] Honor, and again, I just took a note on this when [19] you were sort of recapitulating what you wanted [20] them to identify.

[21] **THE COURT:** Yes.

[22] **MR. GUNTHER:** You said, and [23] certainly any documents that Dr. Jackson relied [24] on in formulating any opinion. And I think Your

Page 44

[1] Honor — I just want to make sure that it's the [2] broader of the two, because obviously they're [3] going to take the position that he didn't rely on [4] any confidential information.

[5] And I think the Verizon position is [6] that they have to look at all the confidential [7] information that was provided, because they're [8] going to argue that he's infected.

[9] **THE COURT:** I'm requiring that they [10] produce the documents that he reviewed in coming [11] to his opinions, whether they will be classified [12] as Verizon confidential documents or not, because [13] I think the issue is going to rest on, to some [14] extent, whether these documents are confidential [15] or not confidential.

[16] There was another issue that was [17] raised about Inline supplementing the issue that [18] was raised by AOL.

[19] **MR. GUNTHER:** Yes, Your Honor. Your [20] Honor, Bob Gunther.

[21] And let me address that. Your [22] Honor, we had, early in the case, asked in [23] interrogatories that required them to identify [24] all persons with whom Inline has communicated or

Page 45

[1] negotiated any agreement relating to the patents [2] in suit, either actual or perspective agreements.

[3] We had also asked them, Your Honor, [4] for documents relating to any agreements relating [5] to the patents in suit, you know, title, or even [6] broader than that. And we also asked them in [7] document requests relating to any efforts to [8] licenses for the patents.

[9] Your Honor, up through February of [10] this year, we were basically sitting there [11] believing that all rights, title and interest [12] resided in Inline with respect to the patents [13] that are involved in this suit. In February — [14] on February 1st of this year in connection with [15] their supplemental production, Inline provided [16] AOL and Earthlink with an agreement that had been [17] executed in March of 2004, which was an exclusive [18] license agreement between Inline, Goodman, who [19] was the named inventor, and a company called [20] Mercury Communications.

[21] Your Honor, Section 4.1 of that [22] agreement, which is the license, basically [23] transfers, as we read it, all substantial rights [24] in the patents in suit, as well as some other

Page 46

[1] patent rights from Inline to Mercury. It's an [2] exclusive paid, perpetual and irrevocable license [3] with respect to a group of patents that includes [4] the four patents in suit.

[5] After reading that document, we [6] immediately began corresponding and communicating [7] with Inline saying, Look, you guys have got to [8] give us all documentation relating to this [9] agreement with Mercury, as well as any other [10] license agreements. And Your Honor will recall [11] that when we were talking about supplementing, [12] one of the things we were supplementing them [13] on, as Your Honor recognized in the conference [14] last November, or maybe — I think it was last [15] June was documents relating to licenses or [16] offers to license or correspondence.

[17] It turns out, Your Honor, from the [18] Mercury agreement, that we — that there are [19] other agreements with a company called Pie [20] Squared, which appears to be some kind of sister [21] entity to Mercury Communications. The person [22] — there's a Pie Squared agreement that is dated [23] also in March of 2004 called the Pie Squared [24] agreement, which was produced to us yesterday.

Page 47

[1] So I'm scrambling a bit here, [2] because I just read it last night. And the [3] Mercury agreements are signed by the same [4] individuals.

[5] There are numerous other documents [6] that we have identified to them in correspondence [7] including an operations agreement through Mercury [8] Communications, which Inline has signed onto as a [9] signatory exhibit to certain of the agreements [10] and other agreements that they have refused to [11] produce to us.

[12] They've also refused to give us any [13] of the correspondence with Mercury, Pie Squared [14] or anyone else relating to

Case 1:05-cv-00866-JJF   Document 88-3   Filed 03/28/2006   Page 4 of 9

**Hearing**
**February 28, 2006**

Inline Connection Corporation   v.
AOL Time Warner Incorporated, et al.

these various license [15] agreements. This stuff has been called for.

[16] It was called for at the outset of [17] the case. And one of the things that [18] particularly concerns us, Your Honor, is that on [19] March 12th, 2004, which is about a week after a [20] bunch of these agreements were signed, that is, [21] the agreement with Mercury and the agreement with [22] Pie Squared, Your Honor, they supplemented their [23] Interrogatory Number 9 relating to any agreements [24] relating to the patent in suit, and didn't reveal

Page 48

[1] any of these agreements.

[2] So as we were, you know, as of March of [3] last year, we were basically sitting there [4] thinking that there was no issue with respect to [5] ownership. And, Your Honor, these agreements are [6] fundamentally related to the ownership issue, we [7] believe.

[8] And one of the reasons for filing a [9] motion to amend is going to be to assert that, in [10] all likelihood as we sort this out, that Pie [11] Squared and Mercury are indispensable parties to [12] this case, and should have been joined to the [13] case years ago, or at least a year and a half [14] ago.

[15] Your Honor, there's one other [16] agreement that was produced that has just been [17] produced to us. That is an agreement that was [18] signed between Pie Squared and Inline in 2003, in [19] June of 2003.

[20] In that agreement, five-percent [21] interest in a bunch of the Inline patents, [22] including the patents involved in this lawsuit, [23] were assigned to Pie Squared by Inline for the [24] price of $25,000.

Page 49

[1] So if you actually extrapolated that [2] out and just, you know, did a multiplication that [3] placed a value on the patents as of that time of [4] half a million dollars. And, Your Honor, that [5] agreement was never produced to us until [6] yesterday.

[7] We got that for the first time. And [8] so what we're very concerned about is for both [9] the damages issues and for the ownership issues, [10] that these documents are just starting to dribble [11] out now after, you know, years after they've been [12] executed, and without any — with a refusal to [13] give us a blanket production with respect to all [14] of these agreements relating to ownership and all [15] of the correspondence.

[16] So we're requesting the Court to [17] direct immediate production of those, of the [18] documents that should have been produced quite [19] awhile back.

[20] THE COURT: Who's going to be [21] addressing this for Inline?

[22] MS. VAN OVER: Your Honor, this is [23] Joel.

[24] THE COURT: Okay, Joel.

Page 50

[1] MS. VAN OVER: As to — let's just [2] take them one by one — supplementing our [3] production, as you know, this is a — these [4] agreements we're discussing are 2004 agreements. [5] And as Your Honor ruled, documents that would be [6] supplemented were to be produced through [7] December 31st, 2003. And we've done that.

[8] And our supplementary interrogatory [9] answers in March of 2004 were done before these [10] agreements came into existence. And I told AOL [11] and Earthlink's counsel that these agreements [12] were not actually signed until late March.

[13] They didn't exist, and I checked [14] this out. They did not exist when we [15] supplemented.

[16] THE COURT: Mm-hmm.

[17] MS. VAN OVER: But I've also shared [18] a case with counsel. It was decided by the [19] Federal Circuit in January of 2006.

[20] THE COURT: Mm-hmm.

[21] MS. VAN OVER: And I put it in one [22] of my letters, the issue of —

[23] THE COURT: How about if you give [24] me the case citation, please. Name.

Page 51

[1] MS. VAN OVER: Your Honor, I will do [2] that. I'm not sure I have that letter in front [3] of me at this moment.

[4] But —

[5] THE COURT: Okay.

[6] MS. VAN OVER: — I will definitely [7] get it to Your Honor.

[8] May I Email that case cite to you —

[9] THE COURT: Sure.

[10] MS. VAN OVER: — if I copy everybody [11] else on it?

[12] THE COURT: Sure. That's fine.

[13] MS. VAN OVER: Okay. The case [14] essentially finds that where there's been an [15] assignment or an exclusive license, rather or a [16] license — let's stick with exclusive license

[17] THE COURT: Yeah.

[18] MS. VAN OVER: — that was entered [19] into after the suit was filed, it is not relevant [20] to either standing or the status of indispensable [21] parties.

[22] And, obviously, we'd like Your Honor [23] to look at that —

[24] THE COURT: Mm-hmm.

Page 52

[1] MS. VAN OVER: — because I think the [2] case is dispositive on the importance of these [3] documents. Notwithstanding that, we have [4] produced the license and the agreement between, [5] as Your Honor heard, Pie Squared, another [6] company, and Inline.

[7] And essentially, the exclusive [8] license does not grant any rights in the current [9] litigation.

[10] THE COURT: Mm-hmm.

[11] MS. VAN OVER: It says that those [12] rights are the right to a relationship to the [13] litigation any way. It's covered by a separate [14] agreement called a litigation agreement, which [15] essentially provides for the investor to fund the [16] litigation.

[17] THE COURT: Okay. And that has, the [18] investor, the litigation agreement has also been [19] produced?

[20] MS. VAN OVER: Yes, it has.

[21] THE COURT: Okay.

[22] MS. VAN OVER: And as to the [23] ownership, we also produced this issue of the [24] five-percent ownership agreement.

Page 53

[1] THE COURT: Mm-hmm.

[2] MS. VAN OVER: A diminimous [3] interest, but we've produced that agreement. The [4] operating agreement, which was mentioned to you [5] is — Mercury is an LLC, and it's a corporate [6] formation document of Mercury Communications, [7] the exclusive licensee.

[8] And we have taken the position that [9] in light of the Astex case, that it's not [10] relevant to get into all of the ownership and [11] relationship issues, that this is really a side [12] issue under current case law.

[13] But we — you know, we have [14] produced all the documents necessary to [15] understand what the relationships are.

[16] THE COURT: Why don't you tell me [17] what documents you haven't produced, Joel.

[18] MS. VAN OVER: We haven't produced [19] the operating agreement.

[20] THE COURT: Okay.

[21] MS. VAN OVER: That's one.

[22] THE COURT: There's more than one [23] agreement. Did you say operating agreements? [24] You said plural?

Page 54

[1] MS. VAN OVER: No. There's only one [2] operations agreement.

[3] THE COURT: Okay.

[4] MS. VAN OVER: So as to the current [5]

Case 1:05-cv-00866-JJF  Document 88-3  Filed 03/28/2006  Page 5 of 9

Inline Connection Corporation v.
AOL Time Warner Incorporated, et al.

Hearing
February 28, 2006

relationship among the exclusive licensee and the [6] investor that's funding the litigation and [7] Inline, those are the current agreements of which [8] I am aware. And —

[9] THE COURT: What else has not been [10] produced that — my understanding is that you've [11] produced the agreements and any licenses.

[12] MS. VAN OVER: Right.

[13] THE COURT: Has there been anything [14] else that hasn't been produced that discusses or [15] deals with the relationship between the parties [16] between Inline and Mercury, or Pie Squared, or [17] any other entity that may have ended up with an [18] interest in these patents?

[19] MS. VAN OVER: I think that what Bob [20] was saying, correspondence related to the [21] agreements.

[22] THE COURT: Mm-hmm.

[23] MS. VAN OVER: I am not aware of any [24] correspondence related to the agreement that

Page 55

[1] would not be privileged. Now, I — we don't [2] represent Mercury.

[3] THE COURT: And the privilege that [4] you would be raising, are you understanding it to [5] be — would be what type of privilege?

[6] MS. VAN OVER: Attorney-client [7] privilege.

[8] THE COURT: Okay. Well, what about [9] communications that could be between Mercury and [10] your client in their discussions and their [11] negotiations? Are you saying that those would [12] have been covered even by the AC? And by AC, I [13] mean, attorney-client privilege.

[14] MS. VAN OVER: I am unaware. I can [15] check that, Your Honor.

[16] THE COURT: Okay.

[17] MS. VAN OVER: To be absolutely [18] certain, I am unaware of any correspondence of [19] that nature. I believe that the negotiations [20] were all oral communications.

[21] So that the documents — any [22] correspondence would have been between Inline and [23] its counsel, and between Pie Squared and its [24] counsel, and Mercury and its counsel.

Page 56

[1] And that —

[2] THE COURT: What about communication [3] between Mercury's counsel and Inline's counsel, [4] or Pie Squared's counsel and Inline's counsel?

[5] MS. VAN OVER: They are — there may [6] have been some — there may

have been, and I'm [7] speculating here, Your Honor.

[8] THE COURT: Yeah, I know.

[9] MS. VAN OVER: There may have been [10] some draft agreements that were exchanged.

[11] THE COURT: Mm-hmm.

[12] MS. VAN OVER: But all those [13] agreements ended up — I mean, the documents that [14] were executed reflect the transaction.

[15] THE COURT: Okay.

[16] MS. VAN OVER: So other than the [17] possibility of some draft agreements that went [18] between the parties, and I don't know if those [19] exist or not, —

[20] THE COURT: Okay.

[21] MS. VAN OVER: — I'm unaware of any [22] correspondence. There might be an Email saying [23] attached is, you know, a draft agreement for your [24] review.

Page 57

[1] THE COURT: What I'm going to [2] suggest, Joel, is that you check to see if there [3] is any correspondence or Emails that were [4] communicated between the parties. That is, not [5] within the parties, but between the parties.

[6] That is, from Inline to either Pie [7] Squared or to Mercury, or from Mercury or Pie [8] Squared to Inline, because I don't consider those [9] to be covered necessarily by any attorney-client [10] privilege. and those should be produced.

[11] I also think the draft documents [12] should be produced. In the end, I don't think [13] they have much relevance, but they may have some [14] information, if there had been any exchange of [15] drafts and suggested modifications.

[16] I am not requiring you to produce [17] communications that occurred between — within [18] Inline and its attorneys in determining in their [19] discussions about how to negotiate, for example, [20] with Mercury or Pie Squared. I am assuming that [21] Inline would not have confidential communications [22] that existed between Pie Squared and Mercury with [23] its attorneys.

[24] But if they do, then I would suggest

Page 58

[1] that confidentiality has been waived, and those [2] can be produced.

[3] MS. VAN OVER: There are no such [4] documents.

[5] THE COURT: Okay.

[6] MS. VAN OVER: There is one other [7] issue I want you to be aware of, Your Honor, and [8] that is just a litigation agreement —

[9] THE COURT: Mm-hmm.

[10] MS. VAN OVER: — that appoints Pie [11] Squared as Inline's attorney in fact and agent.

[12] THE COURT: Mm-hmm.

[13] MS. VAN OVER: So as of that date, [14] or whenever that agreement was struck, there [15] would be a privilege that covered both of them —

[16] THE COURT: Mm-hmm.

[17] MS. VAN OVER: — as to — insofar as [18] Mercury acted as an attorney in fact.

[19] THE COURT: I guess, it would depend [20] upon the circumstances that would arise that [21] would qualify whether or not Mercury was acting [22] as an attorney in fact. Automatic [23] attorney-client privilege does not exist in the [24] sense that if it doesn't fall within the

Page 59

[1] International Machine case, it has to deal with [2] the topic on which the attorney-in-fact [3] designation occurred.

[4] MS. VAN OVER: Right. And there are [5] only communications regarding that relationship. [6] There is no other.

[7] THE COURT: Well, have all these [8] documents been sitting there listed on some type [9] of privilege log? I'm assuming everybody is [10] updating their privilege log consistent with [11] what's required in this Court under the Apollo [12] case.

[13] MS. VAN OVER: We are in the process [14] of updating our privilege logs.

[15] THE COURT: I think it would be a [16] good idea.

[17] MS. VAN OVER: We haven't received [18] any — we haven't received any privilege — we've [19] never received a privilege log from AOL as long [20] as this litigation has been going on, to my [21] knowledge.

[22] THE COURT: Well, we're going to [23] have to work with the assumption that they [24] haven't declared anything from their standpoint

Page 60

[1] as being privileged.

[2] MS. VAN OVER: I don't think that's [3] true.

[4] THE COURT: Oh, I think it probably [5] isn't true. But then they'll have to deal with [6] Rule 37.

[7] MR. GUNTHER: Your Honor, this is [8] Bob Gunther. Just on that, I believe that with [9] respect to the privilege log, I'm going to have [10] to go back, because we did, you know, obviously [11] do document productions very early in the case.

[12] We have not — you know, we have not [13] scheduled documents after the

Case 1:05-cv-00866-JJF    Document 88-3    Filed 03/28/2006    Page 6 of 9

Hearing
February 28, 2006

Inline Connection Corporation   v.
AOL Time Warner Incorporated, et al.

lawsuit had been [14] filed pursuant to agreement by all parties. [15] However, Your Honor, this issue, which is, you [16] know, an issue that goes right to the issue of [17] ownership and damages, these documents either [18] should be produced or they should be scheduled.

[19] And, you know, again, Your Honor, [20] the first we learned of this was in February, [21] last month.

[22] **THE COURT:** Well, you have the [23] contract documents I understand. You may not [24] have anything else, but my understanding is you

Page 61

[1] have the contracts between these parties.

[2] **MR. GUNTHER:** We have the contracts [3] that we got yesterday.

[4] **THE COURT:** Yes.

[5] **MR. GUNTHER:** Some of which [6] yesterday, and one in February. And, Your Honor, [7] if — specifically because you asked what hasn't [8] been produced, the Mercury Communications' [9] operating agreement has not been produced.

[10] The Mercury Communications agreement [11] with Inline, Paragraph 5, of that agreement says [12] that Inline shall be a member of Mercury [13] Communications and shall execute a counterpart [14] signature page from the Mercury Communications [15] operating agreement dated as of the date hereof. [16] That was March 3rd, 2004.

[17] And that's in the consideration [18] section of the Mercury Inline agreement. So, [19] obviously, that document is related.

[20] It's referenced right in the [21] agreement. It should be produced to us.

[22] There is Paragraph 7.3 of the [23] Mercury Inline agreement. It talks about any [24] how to divide up any damages or profits recovered

Page 62

[1] in any suit contemplated by the agreement.

[2] **THE COURT:** And does the agreement [3] indicate that this suit is part of that?

[4] **MR. GUNTHER:** Yes, Your Honor, it [5] does. And it says — basically says shall be [6] distributed in accordance with a separate [7] agreement executed among the parties hereto.

[8] We don't have that agreement or [9] agreements. Your Honor, they also — when they [10] produced the agreement yesterday with Pie Squared [11] which gave Pie Squared broad rights in connection [12] with litigating this case, they did not produce [13] the exhibits.

[14] There are three exhibits, A, B and C [15] attached to that. They did not give us the [16] exhibits.

[17] Your Honor, they also did not give [18] us a participation agreement that involves [19] the first law firm that was involved in this case, [20] the Kyle, Goekjian, Reed & McManus firm that's [21] dated February 27th of 2004, which gives that [22] firm — as near as we can tell, gives them some [23] type of security interest in the patents that are [24] involved in this suit and other assets.

Page 63

[1] **THE COURT:** Let me ask you, Bob: [2] What does that matter?

[3] **MR. GUNTHER:** Your Honor, I think [4] that matters. Again, what we're trying to do is [5] two things.

[6] We're trying to find out who ought [7] to be necessary parties to this case, number one. [8] And number two, we're trying to amass information [9] that would be relevant to the worth of these [10] patents.

[11] All of these agreements, Your [12] Honor — of course, I don't have them. So I'm, [13] in a sense, you know, shooting in the dark.

[14] But my belief is that all of these [15] agreements together ought to be produced to us so [16] that we can assess — again, now, I am looking [17] for discoverable evidence, and not necessarily [18] you know, and evidence that may lead to the [19] discovery of admissible evidence under the — [20] under the Rule 26 standards.

[21] And so what I'm trying now to say [22] is, look, what we have now learned is that there [23] is a web, an absolute web of agreements between [24] Inline, on the one hand, and Goodman, the

Page 64

[1] inventor, and Mercury Communications, a new [2] company we learned about in February.

[3] Pie Squared, you know, an agreement [4] we got yesterday. It's this agreement with the [5] prior law firm who's now bowed out of the case, [6] but has retained some sort of interest in the [7] case. And so it seems to me that all of this [8] stuff ought to be put on the table.

[9] We can then test, assess it and make [10] two determinations. One, who ought to be added [11] to this case in order to, you know — or if they [12] can be added to be the appropriate necessary [13] parties in the litigation.

[14] And, two, you know, what information [15] is contained within these documents that will [16] allow us to develop our damages case. And our [17] damages case, obviously, is one component of [18] that, Your Honor, that they're making these deals [19] for very low amounts of money, you know, while [20] this litigation is going on. And they're turning [21] around and they're going to ask, when they [22] finally do make a damages claim in the case and [23] submit an expert report for, you know, much [24] higher amounts of money, obviously.

Page 65

[1] And so we think that all ought to be [2] put in front of us, and it should have been long [3] ago. But here we are now. It ought to be put in [4] front of us immediately, so that we can make [5] those determinations.

[6] Your Honor, they cited a case to you [7] or at least identified a Federal Circuit case to [8] which Ms. Van Over has referenced. That case [9] deals with standing.

[10] It does not deal with the issue of [11] indispensable party. And she correctly points [12] out that standing is determined at the time that [13] the lawsuit is filed.

[14] **THE COURT:** That's correct.

[15] **MR. GUNTHER:** But the issue of [16] whether a party is indispensable to the conduct [17] of the litigation continues.

[18] **THE COURT:** Yeah.

[19] **MR. GUNTHER:** And so, Your Honor, —

[20] **THE COURT:** Under Rule 19.

[21] **MR. GUNTHER:** — what we're saying [22] is that irrespective of the issue of standing at [23] the time that the lawsuit was filed, we now find [24] that, you know, while the litigation is going on,

Page 66

[1] they are making all of these different deals. [2] And those deals, in our judgment, based on what [3] we've seen so far, requires probably at least two [4] additional entities to be made parties to this [5] case in order for there to be full relief [6] granted.

[7] And that is Mercury Communication [8] and Pie Squared and, frankly, there may be [9] others.

[10] **THE COURT:** Well, I think that also [11] depends upon what the agreements [12] provide as far as whether they have a share or interest in this [13] at the time, and whether they necessarily are [14] indispensable parties, or they're just sharing in [15] the spoils of the victory.

[16] **MR. GUNTHER:** Right. And Your [17] Honor, listen, what I'm saying at this point is [18] this: And, remember, certain of these [19] agreements, a lot of this stuff except for one of [20] the documents we got yesterday, yesterday [21] afternoon.

[22] But what I'm saying is that now we [23] know that these agreements exist. We know there [24] are other agreements, which I've identified at

Case 1:05-cv-00866-JJF   Document 88-3   Filed 03/28/2006   Page 7 of 9

Inline Connection Corporation v.
AOL Time Warner Incorporated, et al.

Hearing
February 28, 2006

Page 67

[1] least some of them. There may be others that I [2] don't know about.

[3] And so what I'm saying is they [4] should be directed to do, by a date certain, that [5] which they should have done before, which is give [6] us every agreement that bears on the issue of [7] either license or ownership of these patents. [8] And that all correspondence, whether [9] non-privileged correspondence relating to any of [10] those deals should be produced to us as it has in [11] the past with respect to licensees that they have [12] like Case and Turk.

[13] They've already produced documents, [14] so that stuff ought to be produced. And they're [15] claiming a privilege, which I believe is highly [16] suspect given the close interrelationship of all [17] of these entities, that at the time that they [18] produced documents, they should also be required [19] to log any documents that they claim are [20] privileged relating to these communications, so [21] that we can sort this out.

[22] Plus, Your Honor, if there's an [23] indispensable party problem, and I suspect that [24] there is a serious one, we're hurdling towards a

Page 68

[1] trial with not even knowing who the proper [2] parties are. That's just not the right way to do [3] this.

[4] The other thing, Your Honor, is [5] we're entitled, in defending ourselves, to have [6] this information to make sure that we can put on [7] the best damage case we can for our clients. And [8] so for those two fundamental reasons, this stuff, [9] which should have been produced long ago, should [10] be produced now.

[11] MS. VAN OVER: Your Honor, can I [12] just respond briefly?

[13] THE COURT: Sure.

[14] MS. VAN OVER: I think that [15] separating out documents that have some potential [16] relevance from documents that have absolutely no [17] bearing on this litigation, the ownership of the [18] patent or licensing of patents is important.

[19] We've produced the litigation [20] agreement which Bob just mentioned that we hadn't [21] produced, which provides for the division of any [22] recovery in this lawsuit. He's got that.

[23] THE COURT: What about the [24] attachments, A through C, that I think was on —

Page 69

[1] MS. VAN OVER: The Pie Squared [2] exhibits. If he doesn't have them, I will [5] certainly get them.

[4] THE COURT: Okay.

[5] MS. VAN OVER: I have no — if they [6] weren't produced, that was unintentional.

[7] THE COURT: Probably just an [8] oversight.

[9] MS. VAN OVER: So that I have no [10] problem with — the Mercury operating agreement [11] is Mercury Communications' corporate formation [12] document. And whether Inline owns a percentage [13] of Mercury or not seems to be irrelevant.

[14] THE COURT: Well, the only —

[15] MS. VAN OVER: Mercury is a company. [16] It's not —

[17] THE COURT: Well, let me just — let [18] me go back a little bit.

[19] And the relevance that I could see [20] on that — and relevant is, quite frankly, a [21] fairly broad term when it comes to discovery — I [22] could see on that is if in exchange for these [23] patents, Inline received a percentage or share in [24] this company, it obviously would have some

Page 70

[1] relevance on the value placed on these patents.

[2] Counsel, I have got — [3] unfortunately, I have got to do a detention [4] hearing that was supposed to start at nine [5] o'clock.

[6] And right now, my inclination, [7] however, is to require for you to produce all [8] agreements that bear on the issue of ownership [9] and license of these patents in suit, including [10] agreements that are referenced in these [11] agreements, so that a full production can occur [12] along those lines about the relationship between [13] the parties, as well as an evaluation of damages.

[14] I'm not saying that they're [15] necessarily admissible. I'm saying that at this [16] stage, the information that I have suggests that [17] they could very well be relevant or lead to the [18] admission of relevant testimony.

[19] At that stage, I'm leaving it, at [20] that point, just the agreements. I'm not [21] requiring that there be an overall production of [22] all correspondence relating to the agreements.

[23] MS. VAN OVER: Your Honor, [24] there's —

Page 71

[1] THE COURT: Yeah. And any document [2] that you don't produce, I think has got to be [3] identified sufficiently.

[4] MS. VAN OVER: I'm sorry.

[5] THE COURT: Sure.

[6] MS. VAN OVER: The one agreement [7] that I didn't cover, real briefly.

[8] THE COURT: Mm-hmm.

[9] MS. VAN OVER: I think Inline's [10] relationship to the former counsel is really not [11] relevant. I mean, how Inline and its former [12] counsel decide to pay for whatever, you know, [13] legal representation it had is really far afield [14] here.

[15] I mean, that's getting into [16] relationships between attorneys and clients.

[17] THE COURT: It does have one [18] relevance, though. I don't know whether the [19] circumstances — I have no idea what that [20] agreement says.

[21] So why don't you do this for me, [22] Joel, why don't you send me a copy of that [23] agreement. I'll look it over and determine [24] whether or not portions of it need to be produced

Page 72

[1] or the whole agreement.

[2] MS. VAN OVER: Okay.

[3] THE COURT: I'll do an in camera [4] review on that one. I understand your concerns.

[5] MS. VAN OVER: Okay.

[6] MR. GUNTHER: Your Honor, I know [7] you've got to go, but I just would ask you to [8] reconsider on the correspondence. That's often [9] where key admissions are.

[10] And allowing them to withhold [11] that —

[12] THE COURT: I understand, Bob, what [13] your concern is. I think at least get the [14] agreements, and we'll go from there. It may be [15] an issue that we readdress if any of the [16] correspondence needs to be produced.

[17] But, you know, if you have the [18] agreements, you've got a huge chunk of what the [19] relationships are and the value. And the fact [20] that you negotiate something, and then end up [21] with something else doesn't — I don't understand [22] the importance of that —

[23] MR. GUNTHER: Thank you.

[24] THE COURT: — if you end up with an

Page 73

[1] agreement at the end that says, This is what [2] we're going to do.

[3] MR. JAMESON: Your Honor, this is [4] Woody Jameson. If I could just make one point, [5] and I know you've sat for an hour, a long time [6] now.

[7] The Georgia-Pacific case makes [8] absolutely clear, for purposes of reasonable [9] royalty, you look at a hypothetical negotiation. [10] And in this case, we have a real world [11] negotiation of the very patents that are at [12] issue.

[13] And the idea that —

Case 1:05-cv-00866-JJF   Document 88-3   Filed 03/28/2006   Page 8 of 9

Hearing  
February 28, 2006

Inline Connection Corporation v.  
AOL Time Warner Incorporated, et al.

[14] **THE COURT:** Wait a minute.

[15] **MR. JAMESON:** — where Mercury or Pie [16] Squared started or where Inline started, and [17] where they then ended up is not at least [18] reasonably calculated to lead to the discovery of [19] admissible evidence. And I am not sure what else [20] would be —

[21] **THE COURT:** Let me — Woody, my [22] understanding is these agreements were entered [23] into in, what, 2004?

[24] **MS. VAN OVER:** Yes.

Page 74

[1] **MR. JAMESON:** Yes.

[2] **THE COURT:** Okay. The lawsuit was [3] filed when?

[4] **MS. VAN OVER:** 2002.

[5] **THE COURT:** Okay. When were these [6] hypothetical negotiations supposed to be going on [7] for the value to process? Wasn't it just before [8] the lawsuits were filed?

[9] **MR. JAMESON:** I am assuming that [10] these negotiations — well, quite frankly, we [11] don't know how long these negotiations have been [12] ongoing, because we haven't seen the documents.

[13] **MR. GUNTHER:** But, Your Honor —

[14] **MR. JAMESON:** But they're certainly [15] at least probative evidence that we need to [16] explore. And one day they may — you may be [17] right, they may be irrelevant one day, but we [18] don't know that.

[19] And certainly our damages experts [20] aren't going to know that unless they have an [21] opportunity to look at where they started and [22] where they ended up.

[23] **THE COURT:** Well, I had said [24] previously that the correspondence that was

Page 75

[1] exchanged between the parties before this [2] attorney-in-fact relationship developed was [3] supposed to be produced. I have no idea when the [4] attorney-in-fact relationship developed.

[5] **MS. VAN OVER:** Same date.

[6] **THE COURT:** Same date as the [7] execution of the documents?

[8] **MS. VAN OVER:** Yes.

[9] **THE COURT:** So what happened, what [10] was going on between the parties before was not [11] covered by any type of privilege?

[12] **MR. JAMESON:** Right. And what [13] we're —

[14] **THE COURT:** And I had already said [15] that was to be produced. It was the [16] attorney-in-fact negotiation from that point on.

[17] I also said Joel does not have to [18] produce the documents or Inline does not have to [19] produce the documents in which — that were [20] covered by Inline talking with its counsel and [21] certainly Mercury talking with its counsel.

[22] And what Joel's indicated to me in [23] previous discussions is that they wouldn't have [24] those documents. And there were very, very few

Page 76

[1] documents of correspondence going back and forth [2] between the parties.

[3] That is, Inline to Pie Squared, [4] Inline to Mercury prior to the time that they [5] actually entered into these agreements.

[6] **MR. JAMESON:** Your Honor, we've got [7] it. I think both Mr. Gunther and I [8] misunderstood.

[9] **THE COURT:** And maybe what I was [10] saying, the correspondence after the point of [11] this attorney-in-fact situation, which would have [12] occurred, in my understanding, March of 2004.

[13] **MR. JAMESON:** We understand.

[14] **THE COURT:** And the correspondence [15] that, Joel, I think you had indicated was [16] extremely limited or practically non-existent as [17] it existed between the parties —

[18] **MS. VAN OVER:** Right.

[19] **THE COURT:** — as far as you know.

[20] **MS. VAN OVER:** Right.

[21] **THE COURT:** So to that extent, that [22] there was correspondence, I do think in these [23] negotiations, I do think that they are relevant, [24] potentially relevant.

Page 77

[1] **MR. GUNTHER:** Thank you, Your Honor.

[2] **THE COURT:** Okay. So that's the [3] limitation. Everybody understands what's going [4] on?

[5] Joel, would you please send me — [6] still send me that opinion? I think it's [7] important for me to have it and review it. But [8] I'm going to allow it at least for those [9] purposes.

[10] I recognize what you're saying about [11] standing. I'm not certain if the opinion is [12] addressed to indispensable party, or I don't [13] think the opinion was necessarily addressed to [14] damages.

[15] **MR. JAMESON:** Your Honor, I have the [16] right case cite right here.

[17] **MS. VAN OVER:** It is indispensable [18] party. I just want that on the record.

[19] **THE COURT:** Okay. I don't know. I [20] just don't know.

[21] **MR. JAMESON:** Your Honor, do you [22] want the case cites? I have them right here.

[25] **THE COURT:** Fine.

[24] **MR. JAMESON:** It's Astex, A-S-T-E-X

Page 78

[1] Eyewear, Inc. vs. Miracle Optics, Inc. 434 Fed [2] 3rd, 133, 6 Fed Circuit 2006.

[3] And then there's also a cite to [4] Sicom, S-I-C-O-M Systems Limited versus Agilent [5] Technologies.

[6] 427 Fed 971, Fed Circuit 2005. I [7] assume that's a typo. In Fed 2001, probably Fed [8] 3rd 971.

[9] **THE COURT:** It has to be Fed 3d if [10] 2005 is correct.

[11] **MS. VAN OVER:** It is. It is Fed 3d.

[12] **THE COURT:** I figured it was Fed 3d.

[13] **MR. GUNTHER:** Your Honor, could we [14] just have a direction that these documents be [15] produced this week?

[16] **THE COURT:** Joel, how much time do [17] you need, do you think? I'm assuming that most [18] of these documents are probably fairly easily [19] accessible.

[20] **MS. VAN OVER:** The only documents [21] that I have are the contracts.

[22] **THE COURT:** Okay.

[23] **MS. VAN OVER:** So I would have to [24] contact Inline and Inline's counsel to see —

Page 79

[1] **THE COURT:** Well —

[2] **MS. VAN OVER:** — what documents [3] there are that exist. I am unaware of any.

[4] **THE COURT:** All right. You're not [5] aware of any. You're not presently aware of any [6] correspondence that existed between Inline and [7] the parties with which it was negotiated?

[8] **MS. VAN OVER:** I am not, but I would [9] have to check with Inline's counsel.

[10] **THE COURT:** I assume you have access [11] to all the agreements that were executed, [12] including any of the attachments to any of the [13] agreements.

[14] **MS. VAN OVER:** Yes. Yes, Your [15] Honor.

[16] **THE COURT:** So you can probably [17] produce those within the next, what, 48 hours?

[18] **MS. VAN OVER:** Yes, Your Honor.

[19] **THE COURT:** So you can produce [20] those. I'm suggesting that you find out as soon [21] as you can about Inline's counsel.

[22] Today is February 27th — 28th. If [23] we go to March 13th, which I think is a Monday, [24] see if — to produce the documents — to produce

Case 1:05-cv-00866-JJF    Document 88-3    Filed 03/28/2006    Page 9 of 9

Inline Connection Corporation v.
AOL Time Warner Incorporated, et al.

Hearing
February 28, 2006

Page 80

[1] the additional documents, if you run into [2] problems, Joel, just get back in touch with me.

[3] **MS. VAN OVER:** That's fine.

[4] **THE COURT:** I will need, though, [5] when you do to at least advise me of the efforts [6] that you made in trying to communicate with [7] Inline's counsel in getting the information.

[8] **MS. VAN OVER:** We should be able to [9] meet the March 13th deadline, Your Honor.

[10] **THE COURT:** I'm hoping that it's not [11] an exorbitant or high amount of documents. In [12] any event, certainly probably nothing in [13] comparison to what's been produced previously.

[14] All right. Get back to me, counsel, [15] concerning what we're going to do next week, [16] whether we're going to be doing this on Monday or [17] Tuesday. And as I said, get back to me by no [18] later than Friday morning.

[19] And it requires counsel to [20] communicate with one another, so I'm expecting [21] one attorney to get back in touch with me to tell [22] me who will be a representative. You guys can [23] figure out who's going to get back in touch with [24] me.

Page 81

[1] **MR. JAMESON:** Thank you, Your Honor.

[2] **MR. GUNTHER:** Thank you, Your Honor.

[3] **THE COURT:** Thank you. Bye now.

[4] (Teleconference was concluded at [5] 9:25 a.m.)

Page 82

State of Delaware       )
New Castle County       )

CERTIFICATE OF REPORTER

I, Heather M. Triozzi, Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public, do hereby certify that the foregoing record, Pages 1 to 82 inclusive, is a true and accurate transcript of my stenographic notes taken on February 28, 2006, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of March, 2006, at Wilmington.

Heather M. Triozzi, RPR, CSR