IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED ACCESS TECHNOLOGIES, LLC, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 05-866-LPS |
| VERIZON INTERNET SERVICES, INC. ET AL., | : | |
| Defendants. | : | |

John G. Day and Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE

Steven Callahan, Martin C. Robson, and C. Luke Nelson, CHARHON CALLAHAN ROBSON & GARZA, PLLC, Dallas, TX

    Attorneys for Plaintiff

Benjamin J. Schladweiler, GREENBERG TRAURIG, LLP, Wilmington, DE

Kevin P. Anderson, DUANE MORRIS LLP, Washington, DC

    Attorneys for Defendants

## MEMORANDUM OPINION

UNSEALED on
March 30, 2021

March 26, 2021
Wilmington, Delaware

STARK, U.S. District Judge:

## I.   INTRODUCTION

Inline Connection Corporation ("Inline") filed suit against Verizon Internet Services, Inc. and other Verizon entities on April 6, 2005, alleging infringement of four U.S. patents. (D.I. 55-1[1]) Broadband Technology Innovations, LLC (f/k/a Mercury Communications I, LLC) ("BBTI") and Pie Squared LLC ("Pie Squared") filed suit against some of the same Verizon parties on May 3, 2006, alleging infringement of the same four patents and an additional patent. (C.A. No. 06-291-LPS D.I. 1) The next day, May 4, 2006, BBTI and Pie Squared joined the action brought by Inline and asserted counterclaims against two of the Verizon entities. (D.I. 103) The Court then consolidated the two actions, collectively referred to herein as the "Verizon Lawsuits." (D.I. 155 ¶¶ 1-2)

On August 11, 2006, various Verizon defendants moved to dismiss the case for lack of subject matter jurisdiction. (D.I. 123) That motion, which was based on standing, was denied without prejudice when the Verizon Lawsuits were consolidated.[2] (D.I. 155 ¶ 3)

Following certain transfers of ownership rights in the patents, United Access Technologies, LLC ("UAT") moved to substitute itself as the sole plaintiff in the Verizon

---

[1] Unless otherwise indicated, all citations to the docket index ("D.I.") are to C.A. No. 05-866-LPS.

[2] This case was transferred to this Court from the Eastern District of Virginia in December 2005 and was originally assigned to the Honorable Joseph J. Farnan, Jr. (D.I. 55, 56, 57) The case was partially stayed on April 13, 2006. (D.I. 92) About a year later, the stay was extended through the resolution of post-trial issues in a related case. (See D.I. 157) In August 2009, the case was administratively closed. (D.I. 159) In light of Judge Farnan retiring from the bench, this case was reassigned to the undersigned Judge in October 2015. On September 28, 2016, the Court reopened the case. (D.I. 177, 178)

1

Lawsuits. (D.I. 163) The motion, later renewed by all the named plaintiffs – that is, UAT, Inline, BBTI, and Pie Squared – was granted on February 21, 2020. (D.I. 198)

Some of the entities that brought the 2006 motion to dismiss for lack of standing no longer exist. (*See* D.I. 204 at 2 n.2) For present purposes, the relevant defendants are Verizon Services Corp., Telesector Resources Group, Inc., Verizon Corporate Services Group, Inc., and Verizon Online LLC (collectively, "Defendants"). On July 15, 2020, these Defendants filed a renewed motion for summary judgment, seeking to dismiss this action for lack of subject matter jurisdiction. (D.I. 203)

## II. BACKGROUND

The history of the parties to this action, and that of various pertinent third parties, is complicated, reflecting intertwined relationships concerning ownership, assignment, and legal authority. What follows is a summary of only the most relevant events.

In 1988, David Goodman, who is a named inventor on each patent-in-suit, started Inline. (*See* D.I. 206-1 Ex. 1 ("Peisner Decl.") ¶ 4) At the time, he was also Inline's president and controlling stockholder. (*See id.*)

Between 1992 and 2002, Inline entered into numerous licenses with third parties, all relating to one or more of the four patents-in-suit:

- In 1992, Inline entered into a non-exclusive license agreement with MPR TelTech Ltd. to manufacture and sell Inline's patented technology.[3]

---

[3] *See* D.I. 206-1 Ex. 11 (March 4, 2004 Exclusive License Agreement Among Inline, Goodman, and Mercury Communications I, LLC), Schedule 2.2, ¶ 4; Peisner Decl. ¶ 5.

2

- In 1994, Inline entered in a non-exclusive license agreement with Terk Technologies, Inc. to exploit Inline's patented technology.[4]

- In 2001, Goodman and Inline granted (i) a non-exclusive license to CAIS, Inc. and CAIS Internet, Inc. to make, sell, and use Inline's patented technology; and (ii) an exclusive license with ownership rights to certain of Inline's patented technology in North and South Korea.[5]

- In 2002, Inline granted exclusive licenses to Wayport Inc. and a non-exclusive license to Georgia Technical Products Corp. to use Inline's patented technology.[6]

In addition, on June 30, 2003, as part of an agreement to fund other patent enforcement endeavors, Inline assigned 5% of its right, title, and interest in all of its patents to Pie Squared. (D.I. 205-1 Ex. 2) By this assignment agreement, the Chief Financial Officer of Paperboy Ventures LLC ("Paperboy") – an investment company that wholly controlled Pie Squared – was irrevocably designated as Inline's "true and lawful attorney and agent in fact" to: (i) settle all lawsuits; (ii) receive, hold, and distribute recoveries; (iii) provide full and complete releases of Inline's claims in connection with any settlement; and (iv) exercise other powers reasonably necessary or desirable in Inline's name and on Inline's behalf, "with full power to legally bind Inline and in full substitution for Inline" as to the granted powers. (D.I. 205-1 Ex. 3 at A029) Pie Squared could not license any of the patents-in-suit or bring any actions to enforce its rights to the patents-in-suit without Inline's consent. (D.I. 206-1 Ex. 12 ¶¶ 4.1, 4.2)

---

[4] See D.I. 206-1 Ex. 11, Schedule 2.2, ¶ 3; Peisner Decl. ¶ 6. This agreement was amended in 1999 by a settlement agreement. (D.I. 206-1 Ex. 11, Schedule 2.2, ¶ 3)

[5] See D.I. 206-1 Ex. 11, Schedule 2.2, ¶ 1; Peisner Decl. ¶ 7.

[6] See D.I. 206-1 Ex. 11, Schedule 2.2, ¶¶ 2, 5; Peisner Decl. ¶ 8.

On March 4, 2004, Inline, Goodman, and BBTI's predecessor, Mercury Communications I, LLC ("Mercury"), entered into an "Exclusive License Agreement." (D.I. 205-1 Ex. 23) Under the Exclusive License Agreement, Inline transferred patent rights to Mercury, giving Mercury (among other things) the sole ability to grant licenses as well as the right to file lawsuits, including "in the name of Inline," and control of such litigation. (*See id.* ¶¶ 4.1, 7.3) In return, Inline received 18% of Mercury. (*Id.* ¶ 5.0) Relevant portions of the Exclusive License Agreement, which refers to Mercury as "Communications," follow.

> 1.4 "**Exploit**" means to make, have made, use, have used, sell, offer to sell, import, export, or otherwise exploit.
>
> . . . .
>
> 1.7 "**Intellectual Property**" means collectively the Goodman Intellectual Property and all of Inline's entire, right, title and interest in and to all proprietary and property rights of every kind and nature, including without limitation all rights and interest pertaining to or deriving from:
>
>     a.    The Goodman Patents . . . .
>
> . . . .
>
> 1.10 "**Inline and Goodman Retained Intellectual Property**" means (a) the right to Exploit the Goodman Patents in the limited field of use defined as 10BaseT Ethernet over voice or 100BaseT Ethernet over voice or confined to point to point communications within a hotel; and (b) the patent applications listed on Schedule 1.10.
>
> . . . .
>
> 4.1 Inline and Goodman hereby grant to Communications an exclusive, paid-up, perpetual, and irrevocable worldwide license in the Intellectual Property to Exploit the Intellectual Property in any field of use covered by the Intellectual Property, or any of the Intellectual Property, except for the limited field of use defined by the Inline and Goodman Retained Intellectual Property. The

4

foregoing license is sublicenseable, in whole or in part, by Communications or by its sublicensees or their sublicensees.

4.2  Inline and Goodman hereby retain[] the right to Exploit the Inline and Goodman Retained Intellectual Property. Inline and Goodman agree that the Inline and Goodman Retained Intellectual Property shall not be assigned or sublicensed by Inline or Goodman to any third party during the term of this Exclusive License Agreement without the prior written consent of Communications, which written consent shall not be unreasonably withheld.

. . . .

4.5  The parties understand and agree that this exclusive license covers all Intellectual Property, *provided, however* if Communications fails to Exploit any part of the Intellectual Property, such as the Patent Application Rights or any patents issuing therefrom, for a period of one hundred twenty (120) consecutive days, as evaluated under a reasonable business judgment standard, then Inline may provide written notice to Communications (the "Reversion Option Notice") of its intention to Exploit such Intellectual Property not being Exploited (the "Reversion Option"). Communications shall have thirty (30) days from receipt of the Reversion Option Notice to begin implementing a plan (as evaluated under a reasonable business judgment standard) to Exploit the Intellectual Property identified in the Reversion Option Notice, and if such implementation does not begin within such thirty (30) day period, then such Intellectual Property shall no longer be subject to the terms of the license set forth in this Agreement. Notwithstanding the foregoing, for so long as Communications is in material compliance with the annual operating budget as approved by (a) members representing a majority interest; and (b) Inline, Inline shall not have the right to exercise the Reversion Option.

. . . .

7.3  Pursuant to this Exclusive License Agreement and the provisions of Chapter 29 of title 35, United States Code, Communications shall have the first right, but not the obligation, to: a) bring suit in its own name, or in the name of Inline and Goodman, at its own cost and expense, and on its own behalf, and/or on behalf of Inline and Goodman on any claim of past, present, or future infringement of the Intellectual Property, or any

5

> of the Intellectual Property, and defend against any counterclaim or affirmative defense for declaratory judgment of patent invalidity, noninfringement, or any other counterclaim; c) in any such suit, enjoin infringement and collect past, present, and future damages, lost profits, and awards of whatever nature recoverable for such infringement; and (d) settle any claim or suit for infringement of the Intellectual Property, or any Intellectual Property, in its sole discretion. If Communications desires to initiate a suit for infringement, at Communications' request, Inline and Goodman shall join in any such suit. Should Inline or Goodman be made a party to any such suit, Inline and Goodman shall be represented by Communications' counsel. If Inline or Goodman elect[s] also to retain or choose its own counsel, Inline or Goodman shall be solely responsible for its (or their) own counsel fees, and all costs and expenses associated with such representation. In any such suit, Communications shall solely control the strategy and day-to-day litigation of the suit. Any damages, profits, fees and awards of any nature recovered or recoverable in any suit contemplated by this 7.3 shall be distributed in accordance with a separate agreement executed among the parties hereto.

(D.I. 205-1 Ex. 23 at A182-83, A185-87)

The instant suit was filed in Inline's name on April 6, 2005. (D.I. 55-1) It was originally filed in the Eastern District of Virginia. (*Id.*) The complaint did not mention Mercury, Paperboy, or Pie Squared, instead alleging that "Inline is the owner of all right, title and interest in" the patents-in-suit. (*Id.* ¶ 24)

A week later, on April 13, 2005, Inline, Goodman, and Mercury entered into a new agreement, referred to herein as the "Verizon Agreement." (D.I. 205-1 Exs. 47 & 48) In the Verizon Agreement, Inline and Goodman designated Mercury as "their true and lawful attorney and agent-in-fact" for purposes of the instant lawsuit, and confirmed Mercury's "sole and absolute discretion" to "pursue, litigate, settle and/or dismiss the" instant lawsuit. (D.I. 205-1 Ex. 48, ¶ 4) The Verizon Agreement also provided that, "[u]pon the final conclusion of the [instant lawsuit] either through final judgment, dismissal or settlement, all Recoveries . . . shall

6

be paid, delivered and allocated between (a) Inline/Goodman and (b) Mercury, such that whatever the ownership percentages in Mercury may be at such time, Inline/Goodman shall receive 40% and the other members of Mercury shall receive 60%." (*Id.* ¶ 8)

On May 28, 2010, Inline, Goodman, Pie Squared, Paperboy, BBTI (Mercury's successor), and other entities entered into an "Asset Purchase Agreement" with UAT, transferring all interests in the patents-in-suit to UAT. (D.I. 206-1 Ex. 3)

## III. LEGAL STANDARDS

### A. Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 585 n.10 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks and emphasis omitted). The Court will "draw all reasonable inferences

in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted), *abrogated on other grounds by Rotkiske v. Klemm*, 890 F.3d 422 (3d Cir. 2018). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252. To defeat the motion, "there must be evidence on which the jury could reasonably find" for the nonmoving party. *Id.*

**B.     Standing**

"Standing is a constitutional requirement pursuant to Article III and it is a threshold jurisdictional issue." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir.

2010) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The plaintiff bears the burden of persuasion to show that it has standing. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). "Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim." *Samsung Elecs. Co., Ltd. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008).

Standing has "both constitutional and prudential components." *Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery Cnty.*, 271 F.3d 140, 145 (3d Cir. 2001) (internal quotation marks omitted). The requirement of constitutional standing derives from the Article III "case" or "controversy" requirement, compelling "a plaintiff to demonstrate that he or she suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *Id.* "[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). Prudential standing requires, among other things, that "a litigant assert his or her own legal rights and not rely on the rights or interests of third parties." *Hill ex rel. Hill v. Pa. Dep't of Corr.*, 521 F. App'x 39, 40 (3d Cir. 2013) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

A patent is "a bundle of rights which may be divided and assigned, or retained in whole or part." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991); *see also* 35 U.S.C. § 261 ("[P]atents, or any interest therein, shall be assignable in law by an instrument in writing."). While all such rights are initially held by the named inventor, they may be licensed or assigned to multiple parties. *Alfred E. Mann Found. for Sci. Rsch. v.*

9

*Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010). "When a sufficiently large portion of this bundle of rights is held by one individual, we refer to that individual as the owner of the patent, and that individual is permitted to sue for infringement in his own name." *Id.* Accordingly, plaintiffs who "hold all legal rights to the patent as the patentee or assignee of all patent rights" can sue in their own name alone. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339-40 (Fed. Cir. 2007) ("Unquestionably, a patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for infringement in its own name.").

Additionally, if a patentee transfers "all substantial rights" in the patent to an assignee, "this amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for infringement in its own name alone." *Id.* at 1340; *see also Sicom*, 427 F.3d at 976; *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) ("[W]here the patentee makes an assignment of all substantial rights under the patent, the assignee may be deemed the effective 'patentee' under 35 U.S.C. § 281 and thus may have standing to maintain an infringement suit in its own name.").

Finally, exclusive licensees – those parties who "hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent" – have constitutional standing. *Morrow*, 499 F.3d at 1340. "However, these exclusionary rights 'must be enforced through or in the name of the owner of the patent,' and the patentee who transferred these exclusionary interests is usually joined to satisfy prudential standing concerns." *Id.* (quoting *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 467, 469 (1926)); *see also Propat Int'l Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007). Put another way, "unlike an assignee that may sue in its own name, an exclusive licensee having fewer than all substantial

10

patent rights . . . that seeks to enforce its rights in a patent generally must sue jointly with the patent owner." *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1347-48 (Fed. Cir. 2001). "By contrast, a bare licensee, i.e., a party with only a covenant from the patentee that it will not be sued for infringing the patent rights, lacks standing to sue third parties for infringement of the patent." *Propat*, 473 F.3d at 1193.

## IV. DISCUSSION

Defendants' motion rests on two independent bases.

First, Defendants contend that Inline lacked constitutional standing when the suit was filed, as Inline at that point had no right to license the accused products or to prosecute or settle a lawsuit alleging infringement of the patents-in-suit. Pointing to the 2004 Exclusive License Agreement, Defendants argue that Inline transferred to BBTI "all substantial rights" in the patents-in-suit, and BBTI's "exclusive and unfettered right to license compels [the conclusion] that Inline lacked standing" because, following the transfer, Inline had no relevant exclusionary rights. (D.I. 204 at 7-10)[7] In addition, Defendants cite paragraph 7.3 of the Exclusive License Agreement, which grants BBTI the exclusive right to file infringement lawsuits, as well as various other provisions that grant further rights to BBTI. (*See* D.I. 204 at 10-11 (citing D.I. 205-1 Ex. 23, ¶¶ 4.3, 7.1, 7.2, 7.3, 8.5); *see also id.* at 14-20 (citing D.I. 205-1 Ex. 23, ¶¶ 1.10, 4.5, 5.0, 7.3, 7.4))

Second, Defendants argue that Inline lacked prudential standing when the suit was filed, as it failed to join Pie Squared, which at the time owned a 5% undivided interest in the asserted patents and was, therefore, a necessary party. In Defendants' view, this prudential standing

---

[7] Although the Exclusive License Agreement granted rights to Mercury, as that entity was known at the time, for simplicity the Court refers to BBTI (as the parties do) because the distinction between Mercury and BBTI is not relevant for present purposes.

defect cannot be cured by the 2010 post-complaint assignment of interest to UAT. (*See* D.I. 204 at 20) Defendants add that, even if Inline is found to have constitutional standing, this same prudential standing defect would apply to BBTI. (*Id.*)

In response, Plaintiff argues that, at the time this suit was filed, Inline owned 95% of the patents-in-suit, leaving Inline with more than the "substantial" interest necessary to maintain its ownership of the patents and, hence, to have standing. (*See* D.I. 206 at 1) According to Plaintiff, Defendants' characterization of the Exclusive License Agreement is incorrect. In its view, even after execution of that agreement, Inline retained: "(i) the exclusive right to exploit the patents-in-suit, and sue to prevent infringement, within the specified field of use [*see* D.I. 206-1 Ex. 11, ¶¶ 1.4, 1.6, 1.10, 4.1, 4.2]; (ii) the right to sue for infringement in any field-of-use (whenever BBTI does not), including the right to make decisions incident to those rights to sue, including whether and under what terms to settle [*see id.* ¶ 7.3]; (iii) the right to pursue current suits for infringement against AOL and Earthlink [*see id.* ¶ 7.5]; (iv) the right to receive infringement damages [*see id.* ¶¶ 7.3, 7.4]; (v) the rights (and responsibilities) under pre-existing licenses [*see id.* ¶ 2.2]; (vi) a qualified reversionary first right to sue for infringement or otherwise exploit the patents in any field of use [*see id.* ¶ 4.5]; (vii) the right to approve BBTI's annual operating budget [*see id.*]; and (viii) the right to judge BBTI's exploitation efforts under a reasonable business [judgment] standard [*see id.*]." (D.I. 206 at 1, 8-17) In particular, as to the field of use, Plaintiff contends that Inline retained "the right to Exploit the Inline and Goodman Retained Intellectual Property" (D.I. 206-1 Ex. 11, ¶ 4.2), adding that this right includes the right to exploit all the patents-in-suit in the specified field of use, i.e., "10BaseT Ethernet over voice or 100BaseT Ethernet over voice or confined to point to point communications within a hotel" (*id.* ¶¶ 1.6, 1.10). (D.I. 206 at 9) Plaintiff also points to Inline's ability to assign or sublicense rights

in this field, subject to BBTI's consent, which BBTI cannot unreasonably withhold. (*See* D.I. 206-1 Ex. 11, ¶ 4.2)

In addition, Plaintiff argues that the limited 5% ownership interest of Pie Squared and the rights granted to BBTI are insufficient to render either entity a necessary party, so those rights fail to defeat Inline's standing as the patent owner. (D.I. 206 at 2) Further, even if the Exclusive License Agreement transferred all substantial rights to BBTI, Defendants joined BBTI and Pie Squared in 2006, and BBTI and Pie Squared asserted patent infringement counterclaims against Defendants. (D.I. 206 at 2) Plaintiff contends that these aspects of the procedural history, along with the 2007 consolidation of this action with the action brought by BBTI and Pie Squared against Defendants, mooted any potential standing defect "over fourteen years ago and within a year of Inline initiating the instant lawsuit." (*Id.*)

Plaintiff further points out that UAT (properly, in Plaintiff's view) moved to substitute itself as the sole plaintiff in this case after it acquired all rights and interests in the patents-in-suit. (D.I. 163) The motion was ultimately granted. (D.I. 198) Hence, according to Plaintiff, UAT, as the 100% owner of the patents-in-suit and the sole remaining plaintiff in this action, has standing to bring the suit against Defendants. (D.I. 206 at 2)[8]

"[T]he touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols.*, 631 F.3d at 1265. "Because the legally protected interests in a patent are the exclusionary rights created by

---

[8] The Court refers interchangeably to "Plaintiff's standing," "UAT's standing," and "Inline's standing," as current-Plaintiff UAT can have constitutional standing under the circumstances of this case only if it shows that former-Plaintiff Inline had such standing at the outset of this lawsuit.

13

the Patent Act, a party holding one or more of those exclusionary rights . . . suffers a legally cognizable injury when an unauthorized party encroaches upon those rights and therefore has standing to sue." *Id.* at 1264-65. Exclusionary rights are "the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention." *Morrow*, 499 F.3d at 1339 (citing 35 U.S.C. §§ 154, 271).[9]

Federal Circuit case law supports Defendants' position that Inline's lack of exclusionary rights warrants summary judgment based on lack of standing. For example, in *Alfred E. Mann*, 604 F.3d at 1362-63, the licensee had the right to grant sublicenses subject to certain conditions. The Federal Circuit held that the plaintiff had standing because not all substantial rights had been transferred from the licensor. *See id.* at 1363. In doing so, however, the court contrasted its analysis with the reasoning in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000). In *Speedplay*, the court held that "a licensee's right to grant royalty-free sublicenses to defendants sued by the licensor rendered illusory the licensor's right to sue." *Alfred E. Mann*, 604 F.3d at 1362 (citing *Speedplay*, 211 F.3d at 1251). Here, BBTI's right to grant royalty-free sublicenses (without conditions and without needing Inline's consent) renders any limited right to sue that Inline may have – assuming any exists – illusory. *See id.* at 1361 ("[T]he nature and scope of the licensor's retained right to sue accused infringers is the most important factor in

---

[9] Recently, the Federal Circuit has explained that a plaintiff may have constitutional standing under Article III but still lack a cause of action under 35 U.S.C. § 281. *See, e.g., Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234-36 (Fed. Cir. 2019); *see also Uniloc USA, Inc. v. Apple, Inc.*, 2020 WL 7122617, at *3 (N.D. Cal. Dec. 4, 2020) ("[C]onfusion about the interplay between this . . . framework of statutory right to sue and our doctrine of standing has long persisted."). Even if the analysis in this case were reframed as statutory rather than constitutional, the Court would reach the same outcome, for essentially the same reasons. In other words, the Court would likewise conclude that Inline lacked a cause of action against the Verizon entities when the suit was filed.

14

determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent."); *see also Uniloc USA, Inc. v. Motorola Mobility, LLC*, 2020 WL 7771219, at *6 (D. Del. Dec. 30, 2020) ("[T]he plaintiff . . . does not possess the right to exclude the defendant from practicing the patent and therefore lacks constitutional standing to sue that defendant if another party has the ability to grant the defendant a license to the patent.").

In *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1343-44 (Fed. Cir. 2014), the Federal Circuit determined that the plaintiff lacked standing where "all substantial rights" in the patent were transferred to a non-exclusive licensee, even though the patentee retained the right to receive a portion of the proceeds from patent enforcement and to terminate the license agreement upon breach by the licensee. The patentee "reserved no right to have control over, to veto, or to be notified of any . . . licensing or litigation activities" by the licensee. *Id.* at 1343. Because "[r]etaining control of these activities" would have been "critical to demonstrating that the patent ha[d] not been effectively assigned to the licensee," the patentee lacked standing. *Id.* Here, as in *Azure*, Inline lacked the right "to have control over, to veto, or to be notified" of any of BBTI's "licensing or litigation activities," so whatever "interest" Inline may have had in this litigation did not confer standing when the suit was filed. *See* 771 F.3d at 1343, 1347.

In *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006), the Federal Circuit articulated three rights that "strongly favor a finding of an assignment, not a license:" (i) "the exclusive right to make, use, and sell products covered by the patent;" (ii) "the right to sue for infringement of the patent;" and (iii) "virtually unrestricted authority to sublicense." Inline transferred each of these rights to BBTI in the 2004 Exclusive License Agreement, which "strongly favor[s] a finding of an assignment, not a license." *Id.* This is further support for the Court's conclusion that Plaintiff lacks standing.

15

Plaintiff argues (*see* D.I. 206 at 13 n.8) that, under the Exclusive License Agreement, Inline retained the secondary right to sue, making this case analogous to *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995). The Court disagrees. Unlike the contract involved in *Abbott*, *see id.* at 1129, the Exclusive License Agreement does not provide Inline the express right to sue if BBTI does not. (*See* D.I. 205-1 Ex. 23, ¶ 7.3) Plaintiff relies wholly on an implied right, but the case law does not support the conclusion that a plaintiff may have standing based on an implied right to sue. Notably, Plaintiff has not pointed the Court to an analogous implied right in any of its cited cases. (*See* D.I. 206 at 12-13) Relatedly, the *Abbott* contract included an express reservation to the patentee of the right to "control the prosecution and any settlements" of any lawsuits brought by the patentee. 47 F.3d at 1129. By contrast, in the Exclusive License Agreement, Inline gave up any right to control the settlement of any lawsuit. (*See* D.I. 205-1 Ex. 23, ¶ 7.3) ("Communications shall have the first right, but not the obligation, to . . . settle any claim or suit for infringement of the Intellectual Property, or any Intellectual Property, ***in its sole discretion***.") (emphasis added) As Defendants note – correctly, as far as the Court is aware – "there has never been a case finding constitutional standing for a plaintiff that ultimately cannot settle the lawsuit filed in its name." (D.I. 208 at 1)

Plaintiff also argues that it has standing based on Inline's retention of the right to "[e]xploit" the patents-in-suit, pointing to the field-of-use carve-out in the Exclusive License Agreement. (*See, e.g.*, D.I. 206 at 9; *see also* D.I. 206-1 Ex. 11 ¶¶ 1.6, 1.10, 4.2) But the cases on which Plaintiff relies for its reading of the field-of-use provision are distinguishable. For example, in *Alps South, LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1383-84 (Fed. Cir. 2015), the relevant field-of-use provision included both the right to exploit and the express right to sue in that field. It did not (like the Exclusive License Agreement here) recite only the right to

16

exploit. *See id.* Similarly, in *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2016 WL 3186890, at *2 (D. Del. June 3, 2016), the relevant field-of-use provision involved "the exclusive, transferable right to practice the patents" in the defined field of use, "including the sole right to sublicense and enforce the patents" in that field. Here, by contrast, Inline's right to "[e]xploit" did not expressly include any right to enforce the patents or to exclude in any way. Indeed, even Inline's right to sublicense could be exercised only with "the prior written consent of Communications." (D.I. 205-1 Ex. 23 ¶ 4.2) Therefore, Inline's retention of the mere right to "[e]xploit," as defined in the relevant agreement, fails to establish standing.

Moreover, the Court agrees with Defendants that Inline's "Reversion Option" under paragraph 4.5 of the Exclusive License Agreement was "essentially meaningless." (D.I. 204 at 18-19) That reality is apparent from Plaintiff's own explanation of the reversionary interest: Inline would recover its rights in the patents-in-suit if, but only if, BBTI did not (in the view of reasonable business judgment) exploit any part of the intellectual property for 120 consecutive days *and* if, but only if, Inline gave BBTI notice of such failing *and* if, but only if, BBTI did not, within the following 30 days, take action to rectify the situation. (*See* D.I. 206 at 6; *see also* D.I. 206-1 Ex. 11, ¶ 4.5) Nothing in the record supports a finding that these eventualities might ever come to pass, and common sense strongly suggests that the rights under this provision are nearly worthless.

The parties disagree on whether Inline assigned all remaining intellectual property rights (including its field-of-use rights) to BBTI on December 30, 2004. (*See* D.I. 204 at 16-17; D.I. 206 at 9 n.5; *see also* D.I. 205-1 Ex. 54 (December 30, 2004 agreement between Goodman, Inline, and Mercury)) But this dispute does not preclude summary judgment. The "touchstone" for constitutional standing is the right to exclude, *WiAV Sols.*, 631 F.3d at 1265, and Inline's

17

right to "[e]xploit" the patents-in-suit in a particular field of use, as articulated in the Exclusive License Agreement, did not include the right to exclude. (*See, e.g.*, D.I. 205-1 Ex. 23 ¶ 4.2) Thus, whether or not Plaintiff retained that right to "[e]xploit" after December 2004, or transferred that right to BBTI, is not relevant to the standing analysis.

Ultimately, Plaintiff attempts to persuade the Court that because it purportedly retains a bundle of rights that some courts have described as substantial in the context of other cases, the Court must conclude that Plaintiff retains substantial rights in the patents-in-suit and therefore has standing. Plaintiff's position lacks merit because it has not shown that the rights that it retains, individually or in combination, are substantial. More importantly, Plaintiff indisputably lacks rights that the Federal Circuit has consistently identified as most important for standing. Without a right to exclude, Plaintiff lacked standing to sue.

For these reasons, the Court agrees with Defendants that Inline lacked constitutional standing when the lawsuit was filed. Given this holding, the Court need not address Defendants' additional, independent basis for relief, i.e., the prudential standing issue. *See, e.g., Strohmeyer v. Surface Rail Corp.*, 2018 WL 11299002, at *2 (3d Cir. Jan. 18, 2018) ("We need not reach the issue of prudential standing in this case because Petitioners have not demonstrated that they meet the requirements for constitutional standing.").

## V.   CONCLUSION

The Court will grant Defendants' motion for summary judgment. An appropriate Order follows.